**Benito GONZALEZ, Plaintiff,**

**v.**

**Michael TILMER, Assistant Public Defender; Moses Collins, Assistant Public Defender; Janet Trafelet, Assistant State Attorney; Kevin Durkin, Assistant State Attorney Randy Rueckert, Assistant State Attorney; and Aubrey O'Quinn, Police Detective, Defendants.**

No. 88 C 6789.

United States District Court, N.D. Illinois, E.D.

Sept. 30, 1991.

Benito Gonzalez, pro se.

Daniel Patrick Slayden, Cook County State's Attorney's Office, Chicago, Ill., for Moses Collins, Kevin Durkin.

Nancy K. Laureto, Dodge Wells, City of Chicago, Law Dept., Corp. Counsel, Chicago, Ill., for Aubrey O'Quinn.

## MEMORANDUM OPINION AND ORDER

BRIAN BARNETT DUFF, District Judge.

Benito Gonzalez, an inmate at the Pontiac Correctional Center, brings this action pursuant to 42 U.S.C. § 1983 seeking damages and other relief for alleged violations of his constitutional rights during an interrogation following his arrest and in the course of the trial that resulted in his conviction. In its order of August 8, 1988, the court dismissed all Gonzalez's claims except his damage claim against Chicago police officer Aubrey O'Quinn. O'Quinn has filed a motion for summary judgment to which Gonzalez has responded with a summary judgment motion of his own. For the reasons that follow, the court grants O'Quinn's motion and denies that of Gonzalez.

Given the liberal construction accorded pro se pleadings under *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), Gonzalez's complaint can be read to assert two claims against O'Quinn.[1] Gonzalez maintains that O'Quinn violated his rights under the Fourth and Fourteenth Amendments by detaining him for forty-eight hours before providing a judicial determination of probable cause. Gonzalez also complains that O'Quinn's harsh treatment of him during this period of detention coerced him into giving an inculpatory statement.

### Facts [2]

O'Quinn arrested Gonzalez at 4:00 p.m. on October 29, 1984. He had reason to believe that Gonzalez was responsible for shooting a waitress in a restaurant because an eyewitness to the crime had given police a description that fit Gonzalez and had identified Gonzalez as the assailant from a photo array. Following the arrest, O'Quinn took Gonzalez to the police station where he was cuffed to a wall in an interview room and questioned. Police meanwhile tried to contact the eyewitness and arrange a lineup. The eyewitness, however, could not come to the police station until the following day. Learning this, detective Timothy Nolan submitted a request to the watch commander to hold Gonzalez past the regularly scheduled court call in order to hold the lineup the next morning. The request was approved and Gonzalez was turned over to the lockup keeper somewhere around 5:00 p.m.

The lineup was held the next day shortly after noon. The eyewitness identified Gonzalez as the man who shot the waitress. After the lineup, Gonzalez was taken back to the interview room where he again was handcuffed to the wall. O'Quinn had no further contact with Gonzalez until the trial.

At approximately 4:00 p.m., assistant state's attorney Janet Trafelet arrived at the station and began questioning Gonzalez. Shortly thereafter, Gonzalez gave Trafelet a statement regarding the shooting incident. Gonzalez asserts he signed it only because Trafelet misinformed him as to the contents of the statement and told him he could go home once he signed it. Gonzalez also maintains that he did not receive any food between the time of his arrest and the time he gave his statement.[3] After he gave his statement, Gonzalez was returned to the lockup where he remained until the next day when he was taken to court for his preliminary hearing. Although the exact time of the preliminary

---

1. Gonzalez appears to assert a third claim in his cross-motion for summary judgment. He maintains that O'Quinn gave false testimony against him at his trial. A police officer, however, is absolutely immune from damages under § 1983 for testimony given during a trial. *Briscoe v. La Hue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). Because Gonzalez' belated claim challenging the truthfulness of O'Quinn's trial testimony is so clearly without merit, the court will not read it into the complaint.

2. The facts in this opinion are construed in the light most favorable to Gonzalez, consistent with this court's ruling in favor of O'Quinn.

3. O'Quinn avers that Gonzalez was fed during his detention at the police station. The account of events in Gonzalez' affidavit also contradicts the facts he set out in the signed statement he gave to police. Gonzalez declared in his statement both that the police had fed him and that the state's attorney had bought him a hamburger.

hearing is not in the record, it appears that it was held in the late afternoon.

A jury convicted Gonzalez of aggravated battery, armed violence, and attempt murder. The appellate court vacated the conviction for aggravated robbery and armed violence and affirmed the conviction for attempt murder. That conviction has withstood several collateral challenges in both state and federal court.

## Discussion
### Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has pointed out the lack of a genuine issue of material fact, a nonmoving party who bears the burden of proof on an issue may not rest on the pleadings. He instead must come forth with specific facts through affidavits or other materials showing that a genuine issue of material fact exists and requires trial. *Id.* at 324, 106 S.Ct. at 2553; *Morgan v. Harris Trust and Savings Bank*, 867 F.2d 1023, 1026 (7th Cir.1989). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### Exhaustion of Habeas Corpus Remedies

■ O'Quinn advances several grounds in support of his motion for summary judgment. He first asserts that Gonzalez's challenge to the conditions of his detention is essentially a challenge to the fairness of his trial which can only be made in a habeas corpus petition because it amounts to a constitutional challenge to his conviction. Accordingly, O'Quinn, citing *Hernandez v. Spencer*, 780 F.2d 504 (5th Cir.1986), contends that Gonzalez cannot bring his § 1983 claim until after he has exhausted

the remedies available to him under the habeas corpus statutes. Although it is true that an imprisoned § 1983 plaintiff must first exhaust his habeas remedies before pursuing his civil rights claims, *see Hanson v. Heckel*, 791 F.2d 93 (7th Cir. 1986), that requirement does not preclude this action.

This action would not interfere with ongoing state proceedings, undermine the validity of a criminal conviction or facilitate the circumvention of the federal habeas corpus statutes, the rationales for requiring the exhaustion of post-conviction remedies. *See Scruggs v. Moellering*, 870 F.2d 376, 378–379 (7th Cir.1989); *see also Johnson v. Chicago*, 712 F.Supp. 1311, 1316–17 (N.D.Ill.1989). In *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991), the Supreme Court stated that admission at trial of a coerced confession is "simply an error in the trial process itself" rather than a "structural defect" in the constitution of the trial. Relying on that distinction, the Court then ruled that the admission of a coerced statement will not render a conviction invalid if it was harmless beyond a reasonable doubt. In light of *Fulminante*, a finding that Gonzalez's statement was a product of state coercion would not necessarily, and in fact would almost certainly not, undermine his conviction. Judge Prentice Marshall dismissed Gonzalez's federal habeas corpus petition finding the evidence of his guilt "overwhelming." *United States ex rel. Gonzalez v. Chrans*, 87 C 10372 (N.D.Ill. June 27, 1988). That dismissal was affirmed on appeal after the close of briefing on O'Quinn's summary judgment motion. No. 88–2468 (7th Cir. Apr. 17, 1990).

■ More to the point, however, this § 1983 claim is not precluded because Gonzalez has in fact exhausted his habeas remedies. He has no further avenues of relief to challenge the fact of his conviction. Gonzalez was unsuccessful before the state postconviction court which found that he had waived his claim regarding his allegedly coerced statement by failing to raise it on direct appeal. In addition, as mentioned above, Judge Marshall's dismissal of Gon-

zalez's federal habeas corpus petition was affirmed by the Seventh Circuit after the close of briefing in this motion.[4]

### Conditions of Detention/Coerced Statement

■ The crux of Gonzalez's suit against O'Quinn goes not to the fairness of the criminal trial (hence the concern over exhaustion of habeas remedies) but rather to the alleged acts of coercion themselves. At the outset, it must be remembered that a police officer who takes a statement from a suspect is not responsible for determining whether that statement was sufficiently voluntary to be admitted into evidence. The mere fact that an involuntary statement was introduced at trial therefore is not be enough to subject him to § 1983 liability. *See Duncan v. Nelson,* 466 F.2d 939, 942 (7th Cir.), *cert. denied,* 409 U.S. 894, 93 S.Ct. 116, 175, 34 L.Ed.2d 152 (1972) (police officers who coerced defendant's confession were not proximate cause of the confession's introduction in evidence at trial) (untenable to conclude that police officers would foresee that trial judge would erroneously admit unlawful confession); *cf. Hensley v. Carey,* 818 F.2d 646 (7th Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 395 (1987) (police officer conducting lineup not liable because defendant has no right to be free from an unduly suggestive lineup separate and apart from his right to fair trial). After all, Gonzalez had available procedures to protect his right to a fair trial independent and apart from any role O'Quinn may have played in the taking of his statement. For example, if the statement were coerced as he alleges, he could have moved to have the statement suppressed.

The concern here thus is not with the admission of the statement at Gonzalez's trial. The concern is over the means employed to extract it. Although those who take a statement from a suspect may not be responsible for determining whether that statement is voluntary and therefore admissible at trial, they are responsible for their treatment of the suspect. The relevant legal question then is not whether Gonzalez gave a voluntary statement, but whether O'Quinn violated any of Gonzalez's constitutionally protected rights by compelling Gonzalez to incriminate himself "by fear of hurt, torture, exhaustion, or any other type of coercion. . . ." *Duncan,* 466 F.2d at 944.

The court then must examine the O'Quinn's acts to see whether they caused an infringement of constitutionally protected rights. Gonzalez gave his statement approximately twenty-four hours after his arrest. The act of coercion Gonzalez singles out in the complaint as unconstitutional is the deprivation of food between his arrest and the giving of his statement. Under the facts here, however, O'Quinn had Gonzalez in custody for only two relatively brief periods during those twenty-four hours. He had custody of Gonzalez for an hour or two following Gonzalez's arrest at 4:00 p.m. and then again the next morning between 10 o'clock and the completion of the lineup sometime that afternoon. Altogether, Gonzalez was in O'Quinn's custody for at most eight hours. The issue therefore is whether O'Quinn's failure to feed Gonzalez during those eight hours violated Gonzalez's constitutional rights.

■ Before addressing this issue, it is necessary to identify exactly which constitutional right is involved in Gonzalez's claim. The Fourth Amendment protects arrestees while the Fourteenth Amendment is the principal source of protection for pretrial detainees (*i.e.,* suspects who have

---

**4.** Allowing Gonzalez to proceed with his claim is consistent with this court's recent decision in *Hickombottom v. McGuire,* 765 F.Supp. 950 (N.D.Ill.1991). *Hickombottom* held that plaintiff could not proceed with his § 1983 coerced confession claim because it sounded in habeas corpus. But *Hickombottom* is distinguishable from this case. Unlike the plaintiff there, Gonzalez has exhausted all his remedies and can no longer use his coerced confession claim to challenge his conviction in either state or federal court. In *Hickombottom,* however, plaintiff failed to demonstrate a lack of an available state remedy. Furthermore, principles of issue preclusion barred *Hickombottom* from pursuing his § 1983 claim because the state court had already explicitly found the confession to be voluntary in a pretrial suppression hearing.

been charged). Courts have had some difficulty, however, in determining when Fourth Amendment protection ends and when Fourteenth Amendment protection takes over in claims arising from acts occurring between the time of a suspect's arrest and the time he is charged. *See Jones v. Chicago,* 856 F.2d 985, 994 (7th Cir.1988). In *Jones v. County of DuPage,* 700 F.Supp. 965, 972 (N.D.Ill.1988), this court held that an individual arrested without a warrant remains an arrestee until he is brought before a judicial officer for a probable cause determination. Under this analysis, claims regarding the conditions of detention prior to the probable cause hearing are judged by the reasonableness standard of the Fourth Amendment.

The Seventh Circuit, however, implicitly rejected this view in *Wilkins v. May,* 872 F.2d 190 (7th Cir.1989), *cert. denied,* 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990), a case involving a show of force to extract a confession. *Wilkins* held that the Fourth Amendment protection against unreasonable seizures lasts only until such time as the arrestee "has been securely placed in custody." *Id.* at 193. Thus, under *Wilkins,* use of force during an interrogation is analyzed as a question of substantive due process under the Fourteenth Amendment.

> The relevant liberty is not freedom from unlawful interrogations but freedom from severe bodily or mental harm inflicted in the course of an interrogation. We do not undertake to specify a particular threshold, a task that may well exceed our powers of articulation. But it is a high threshold, and to cross it Wilkins and plaintiffs like him must show misconduct that a reasonable person would find so beyond the norm of proper police procedure as to shock the conscience, and that is calculated to induce not merely momentary fear or anxiety, but severe mental suffering.

*Id.* at 195.

Subsequent to *Wilkins,* the Supreme Court decided *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Expressing reluctance to apply a substantive due process analysis when the right allegedly infringed is covered by "an explicit textual source of constitutional protection," *Graham* rejected use of the "shock the conscience" test in cases alleging excessive use of force by police. *Id.* at 395, 109 S.Ct. at 1871. The Court held that *"all* claims that law enforcement officers have used excessive force—deadly or not— in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard...." *Id.* (emphasis in original). Whether the Fourth Amendment protection extended to the period between arrest and pretrial detention was, however, expressly left open. *Id.* at 395 n. 10, 109 S.Ct. at 1871 n. 10. The question posed here therefore was not decided.

Although *Graham* 's pretermission of the question formally left *Wilkins* standing, the *Graham* decision actually cast significant doubt on *Wilkins* 's continuing validity. In *Henson v. Thezan,* 717 F.Supp. 1330 (N.D.Ill.1989), this court had occasion once again to explore the reach of the Fourth Amendment in the context of a § 1983 claim challenging the use of force to extract a confession prior to a judicial determination of probable cause. Examining *Wilkins* in light of *Graham,* this court in *Henson* observed that the § 1983 plaintiff in *Graham* was "securely in custody" yet the Supreme Court analyzed his claim under the Fourth rather than the Fourteenth Amendment. That observation led to a conclusion that *Wilkins* was so severely undermined that, absent a further contrary ruling from the Seventh Circuit, this court's holding in *Jones v. County of DuPage* (conditions of detention prior to probable cause hearing judged by Fourth Amendment's reasonableness standard) could still be considered a valid statement of the law. 717 F.Supp. at 1336. The Seventh Circuit has not spoken further on the issue since the Supreme Court's ruling in *Graham.*[5] Consequently, following

---

**5.** Two circuits appear to have addressed the

issue since *Graham* was decided. In *Powell v.*

*Henson*, the court will review Gonzalez's claim within the framework of the Fourth Amendment's reasonableness test.

■ *Graham* set out the guidelines for applying the Fourth Amendment's reasonableness test. The test is an objective one. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." 490 U.S. at 397, 109 S.Ct. at 1872. The court must put itself in the shoes of the officer and judge whether his actions were reasonable under the circumstances of the particular case. *Id.* at 396, 109 S.Ct. at 1872. *Graham* made clear that certain circumstances could call for the use of some force without violating the Fourth Amendment. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chamber," violates the Fourth Amendment. *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). "Determining whether the force used to effect a particular seizure is 'reasonable' under the

Fourth Amendment requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)). Thus, in determining whether application of a particular use of force is objectively reasonable, the court must weigh the individual's Fourth Amendment privacy interests against the need for the type of force the police used.

■ The coercive force in this case was more psychological than physical. Gonzalez asserts that O'Quinn denied him food. While the court does not rule out the possibility that use of psychological force would in certain circumstances be constitutionally unreasonable, the denial of food alleged in this case certainly did not amount to a violation of Gonzalez's Fourth Amendment rights. Moreover, under the facts of this case, O'Quinn had control of Gonzalez for only a limited time. With exception of lunchtime on the day following his arrest, Gonzalez was not in O'Quinn's custody dur-

*Gardner*, 891 F.2d 1039, 1044 (2d Cir.1989), the Second Circuit followed the approach suggested by this court. It extended *Graham* into the police station, holding the Fourth Amendment standard governed "at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer." A district court in that circuit has gone further and used the Fourth Amendment to judge the claim of an arrestee who did not remain in the custody of the arresting officer throughout the period of his pre-arraignment detention. *Freece v. Young*, 756 F.Supp. 699, 703–04 (W.D.N.Y.1991).

The Ninth Circuit has reached somewhat conflicting results in two cases. In *Hammer v. Gross*, 932 F.2d 842, 845 n. 1 (9th Cir.1991) (en banc), the court followed *Graham* and applied the Fourth Amendment to a claim contesting the use of force to extract a blood sample at a hospital where police had taken plaintiff following his arrest on charges of driving under the influence of alcohol. The court based its decision on the ground that an attempt to secure a blood sample for evidence of blood-alcohol content was a seizure incident to arrest. In *Cooper v. Dupnik*, 924 F.2d 1520 (9th Cir.), *rehearing en banc granted*, 933 F.2d 798 (9th Cir.1991), however, the court applied a substantive due process analysis to a claim that police used coercion in

an unsuccessful attempt to elicit a confession from a suspect whom they later released without charges. The court did not view the claim as governed by *Graham* because "little physical force was employed against Cooper in his arrest." *Id.* at 1530 n. 19.

*Cooper* appears to miss the point of *Graham*. *Graham* does not look to the extent of force used in determining whether to judge a claim under the Fourth Amendment or substantive due process. Instead, it expresses a decided preference for looking to a particular constitutional provision that by its terms protects against the abuse alleged. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908 (1966). Use of excessive force to extract information from a suspect who has been seized and interrogated before being formally charged with a crime is as much an affront to personal privacy and dignity as use of force to effect the initial seizure or to extract blood in the immediate aftermath of the seizure. This court thus finds *Hammer* to be the more persuasive of the two opinions.

ing a time normally associated with eating. Given the press of time and the need for arranging the lineup at an hour convenient to the man who witnessed the crime, it would not be objectively unreasonable for O'Quinn to require Gonzalez to forego his lunch. As Gonzalez does not assert that he ever complained to O'Quinn about missing meals or being hungry, O'Quinn cannot be faulted for Gonzalez's failure to receive food for the twenty-four hour period leading to the taking of his statement. Consequently, the court finds that O'Quinn did not use unreasonable force to coerce an involuntary statement from Gonzalez.

*Cooper v. Dupnik, supra* at n. 5, supports dismissal of Gonzalez's claim. The psychological intimidation used by the police in that case was far more severe than that purportedly experienced by Gonzalez. The plaintiff in *Cooper* was held incommunicado for twenty-four hours. Police intensely interrogated him for four hours using psychological pressure to browbeat him into confessing to a crime he did not commit. Although the court held that the conduct surrounding the interrogation did not violate plaintiff's substantive due process rights, it noted that it would have reached the same result had it employed the reasonableness analysis under *Graham*. 924 F.2d at 1530, n. 19. Given that O'Quinn had reason to require Gonzalez to miss lunch and that his actions barely intruded upon Gonzalez's right to be free from a seizure that abused his interests in privacy and dignity, the court concludes as a matter of law that his conduct was reasonable under the Fourth Amendment. Accordingly, it grants his motion for summary judgment as to Gonzalez's coerced statement claim.

### Extended Detention

Gonzalez's claim that O'Quinn violated his right to a prompt judicial determination of probable cause remains. O'Quinn responds to Gonzalez's extended detention claim by invoking a qualified immunity defense. He maintains the law in effect in October 1984 did not clearly establish a suspect's constitutional right to appear before a judge or magistrate within 48 hours of his arrest.

■ Under the qualified immunity standard established in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), a government official who violates an individual's constitutional rights may still escape damage liability. The test for determining whether to extend qualified immunity to a § 1983 defendant is purely objective. "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. A right is not clearly established unless the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). To determine whether a right was clearly established, the court looks to closely analogous cases decided prior to the time defendant took the action challenged in the complaint. *Rakovich v. Wade*, 850 F.2d 1180, 1205 (7th Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). A reasonable police officer cannot be expected to be aware of a right unless it is sufficiently particularized to put him on notice that his conduct probably is unlawful. *Klein v. Ryan*, 847 F.2d 368, 371 (7th Cir.1988).

■ "Qualified immunity implements two mutually dependent rationales, the need to encourage the vigorous exercise of official authority as required by the public good and the need to avoid unfairly subjecting the official to liability for the good faith exercise of discretion pursuant to a legal obligation." *Coleman v. Frantz*, 754 F.2d 719, 727–28 (7th Cir.1985) (citations omitted). To further these rationales, qualified immunity protects from liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Thus, a police officer is entitled to qualified immunity "if

officers of reasonable competence could disagree" on whether the disputed action was constitutionally forbidden. *Id.* Finding that the law in 1984 was not sufficiently clear to preclude detaining a suspect overnight in the circumstances of this case, the court agrees that O'Quinn is entitled to qualified immunity.

*Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975) is the seminal case establishing an arrestee's right under the Fourth Amendment to "a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." The precise parameters of *Gerstein,* however, were purposely left undefined. *Schall v. Martin,* 467 U.S. 253, 275, 104 S.Ct. 2403, 2415, 81 L.Ed.2d 207 (1984). The Court did not spell out what it meant by "extended" pretrial restraint. It gave some guidance in its observation that an officer who had probable cause for an arrest could retain custody of the suspect "for a brief period of detention to take the administrative steps incident to arrest." *Id.* at 114, 95 S.Ct. at 863. But it was left to later decisions to give further definition to the right.

Gonzalez cites no pre–1984 excessive detention cases interpreting *Gerstein* that involved facts similar to his. This court's research has revealed one such case from our court of appeals, *Llaguno v. Mingey,* 739 F.2d 1186 (7th Cir.1984), *en banc,* 763 F.2d 1560 (7th Cir.1985).[6] Police held plaintiff in *Llaguno* for forty-two hours without charging him even though the state's attorney twice had told them that he could not approve charges against the plaintiff due to a lack of sufficient evidence. Police continued to hold plaintiff for twenty-four hours after prosecutors told them that no charges would be filed. A magistrate was available at all times that plaintiff was in custody. The officers explained that they were holding plaintiff to ensure that he had no complicity in the crime for which he had been arrested. The court held that the extended detention without a judicial determination of probable cause violated the Fourth Amendment and had little difficulty in finding that the police, given the circumstances of the detention and their "clearly unacceptable reason for the delay" in releasing plaintiff, acted so far beyond the pale of what was reasonable under *Gerstein* as to defeat any qualified immunity defense. *Id.* at 1197. But the facts in this case are nowhere near as egregious as those that confronted the court in *Llaguno,* and the specific facts of the case are crucial to a determination of whether the right at issue was clearly established. *Anderson,* 483 U.S. at 640–41, 107 S.Ct. at 3039.

The procedure that O'Quinn followed in this case is more akin to the Houston Police Department procedure reviewed in *Sanders v. City of Houston,* 543 F.Supp. 694 (S.D.Tex.1982), *aff'd without published opinion,* 741 F.2d 1379 (5th Cir.1984), a case cited approvingly in *Llaguno.* 739 F.2d at 1196. Plaintiffs in *Sanders* challenged a police policy that permitted extended detention on an "investigative hold." Finding that the policy had violated the plaintiffs' Fourth Amendment rights, *Sanders* held that police could not detain an individual arrested without warrant for more than twenty-four hours without a judicial determination of probable cause. *Id.* at 705. Nonetheless, the court recognized that, within that twenty-four hour time limit, police could delay presentment in order to stage a lineup. *Id.* at 700–01. The court noted that *Gerstein* expressly allowed police to complete certain administrative steps incident to an arrest before taking the arrestee before a judicial officer for a probable cause determination. It concluded that investigative detention for purposes of interrogation or allowing a witness to view a defendant prior to his presentment to a judicial officer was a salutary procedure that could properly be considered a permissible administrative step under *Gerstein.* *Id.*

---

**6.** The court recognizes that Gonzalez bears the burden of providing caselaw to establish that O'Quinn violated a clearly established constitutional right, *Klein,* 847 F.2d at 371. Nonetheless, because Gonzalez is a pro se prisoner with limited legal research skills, the court has independently reviewed the cases to determine the state of the law in 1984.

O'Quinn sought to keep Gonzalez overnight primarily so that police could arrange a lineup. Unlike the suspect in *Llaguno*, Gonzalez was not kept in custody against the advice of the prosecutor solely in the hopes of developing a case. Although Gonzalez remained in custody for more than two days, only the first twenty-four hours are attributable to O'Quinn since he relinquished custody of Gonzalez at the lineup. O'Quinn thus cannot be held responsible for Gonzalez's detention for an additional day after the lineup. *See Hickombottom,* 765 F.Supp. at 953–54. In any event, after *County of Riverside v. McLaughlin,* —— U.S. ——, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), the detention of Gonzalez for a day following the lineup adds little of material significance to Gonzalez's claim.

In *McLaughlin* the Supreme Court revisited *Gerstein.* The Court found it necessary to elaborate on the *Gerstein* standard in part because it was not sufficiently clear. "Unfortunately, as lower court decisions applying *Gerstein* have demonstrated, it is not enough to say that probable cause determinations must be 'prompt.' This vague standard simply has not provided sufficient guidance." 111 S.Ct. 1661. In fashioning a more specific promptness requirement, *McLaughlin* established forty-eight hours as the line of demarcation for a claim of extended detention. If an arrestee is provided with a probable cause hearing within forty-eight hours of his arrest, the presumption is that it was sufficiently prompt to comply with the Fourth Amendment. *Id.* at 1670. After two days of detention, the burden shifts to the government "to demonstrate the existence of a bona fide emergency or other extraordinary circumstances" justifying the delay in presentment of the arrestee to a judicial officer. *Id.* The Court made it clear, however, that the forty-eight hours period was only an outer limit and that each delay had to be examined in light of the individual circumstances of the case. The Court noted that lesser delays might be unreasonable if induced by such improper purposes as "gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.*

■ *McLaughlin* thus recognized the vagueness of the *Gerstein* guidelines. If *Gerstein* was too vague to give sufficient guidance to the courts, a police officer acting in 1984 could hardly be expected to fathom its fine constitutional nuances. That is not to say that any officer who detained an arrestee for a prolonged period without a reasonable justification could evade liability on grounds of qualified immunity. As the Seventh Circuit noted in *Patrick v. Jasper County,* 901 F.2d 561, 567 (7th Cir.1990), whether a period of detention is reasonable must be analyzed "in light of the all the circumstances accompanying the detainees' arrest, including transportation, booking, filing, photographing, fingerprinting, identity verification and criminal record 'wanted' checks, as well as the number of individuals to be processed with the detainee in question." Certain actions, such as a detention for one of the improper purposes cited in *McLaughlin,* clearly were unreasonable even under *Gerstein.* Thus, an officer who detained a suspect for nearly two days merely for the purposes of investigating a crime still could be held answerable in damages in 1984. *Cf. Llaguno v. Mingey,* 763 F.2d 1560, 1570 (7th Cir.1985) (en banc) (reversing and remanding extended detention claim for trial on damages). But the record here contains no evidence of any improper motivation on the part of O'Quinn. Indeed, an official city policy in force at the time countenanced the overnight detention of Gonzalez.

■ At the time relevant to this case, the City of Chicago had in effect a general order that embodied a "hold past court call" policy. Under General Order 78–1, ¶ 6(C)(2) of the Chicago Police Department, a police officer could apply to the watch commander to hold an arrestee past court call if the officer ascertained there was a need for further investigation. O'Quinn followed this procedure in requesting that Gonzalez be held overnight in order to conduct a lineup. Although a federal judge declared the policy unconstitutional in 1986,

*Robinson v. Chicago,* 638 F.Supp. 186 (N.D.Ill.1986), *rev'd on other grounds,* 868 F.2d 959 (7th Cir.1989), it was standard authorized practice in 1984. An officer who is following a statute or administrative rule should generally be accorded qualified immunity for his actions unless a reasonable officer should have known that the law or rule in question was unconstitutional. *See Richardson v. Bonds,* 860 F.2d 1427, 1432 (7th Cir.1988); *see also Gittens v. Le Fevre,* 891 F.2d 38, 42–43 (2d Cir. 1989). But at the time of Gonzalez's detention, there had been no judicial determination of the constitutional validity of the City's "hold past court call" policy and *Gerstein* could reasonably be understood to permit a twenty-four hour detention for purely administrative purposes like arranging a lineup. In these circumstances, O'Quinn could reasonably rely on the City's order for continuing Gonzalez's detention. *See Richardson,* 860 F.2d at 1434; *cf. Woods v. City of Michigan City,* 940 F.2d 275, 281 (7th Cir.1991) (police granted qualified immunity because reliance on judicially promulgated policy objectively reasonable). Accordingly, the court finds that he is entitled to qualified immunity on Gonzalez's extended detention claim.

## Conclusion

Gonzalez's motion for summary judgment is denied and O'Quinn's motion for summary judgment is granted. With Gonzalez entitled to no relief on his complaint, the clerk is directed to enter judgment dismissing this case in its entirety.